**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: sbogdanovich@bursor.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—SOUTHERN DIVISION

| | |
|---|---|
| BILJANA GALLARDO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>REDFIN CORPORATION,<br><br>Defendant. | Case No.  8:26-cv-983<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Biljana Gallardo ("Plaintiff"), by and through her attorney, brings this action on behalf of herself and all others similarly situated.  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    This is a class action suit brought against Defendant Redfin Corporation ("Defendant" or "Redfin") for violating various state and federal video and financial privacy laws. Redfin disclosed consumers' private video consumption history, along with their mortgage loan application answers, to Meta Platforms, Inc. ("Meta")  and TikTok USDS Joint Venture LLC ("TikTok") without their consent.

2.    Redfin owns and operates www.redfin.com (the "Website"), one of the most heavily trafficked online real estate platforms in the United States. The Website hosts individual property listing pages on which Redfin delivers prerecorded property videos that consumers watch to learn about, evaluate, and decide whether to pursue particular homes. The Website also hosts an interactive "pre-qualification" mortgage application through which consumers provide deeply sensitive financial information—including their credit score band, home purchase timeline, property type preferences, and related financial details.

3.    Unbeknownst to Plaintiff and the millions of consumers who use the Website, Redfin has embedded invisible tracking code known as the "Meta Pixel" and the "TikTok Pixel" on the Website. These pixels surreptitiously intercept and transmit consumers' private video-viewing activity and confidential financial information to Meta and TikTok, respectively, without consumers' knowledge or consent.

4.    When a Redfin user clicks the "Video" button on a property listing to watch a prerecorded video of a specific home, Redfin's Meta Pixel transmits a "SubscribedButtonClick" event to Meta. The transmission includes: (i) the fact that

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    2

the user clicked the "Video" button, (ii) the URL and title of the property listing page (which identifies the specific property whose video the user requested, such as "23971 Stillwater Ln, Laguna Niguel, CA 92677 | MLS# OC26054865 | Redfin"), (iii) the user's unencrypted Facebook ID via the c_user cookie, and (iv) a hashed version of the user's phone number as an "Advanced Matching" parameter.

5.    Simultaneously, Redfin's TikTok Pixel transmits a "Button Click" event to TikTok containing: (i) the fact that the user clicked a button with inner text "Video," (ii) the property listing's page URL, and (iii) a hashed version of the user's phone number, and (iv) a hashed version of the user's email address.

6.    These disclosures violate the VPPA, which prohibits a "video tape service provider" from knowingly disclosing to any person "personally identifiable information" that identifies a consumer as having requested or obtained specific video materials from the provider. 18 U.S.C. § 2710(b)(1).

7.    Redfin's conduct also violates the ECPA and CIPA. Through the Meta Pixel and the TikTok Pixel, Redfin simultaneously intercepts and discloses to Meta and TikTok – without consent and in real time – the confidential communications that Redfin's consumers submit through Redfin's mortgage pre-qualification survey. Those communications include highly sensitive "nonpublic personal information" as defined by the Gramm-Leach-Bliley Act ("GLBA"), 16 C.F.R. § 313.3, and the California Financial Information Privacy Act ("CalFIPA"), Cal. Fin. Code § 4050, et seq. – for example, a consumer's self-reported credit score range, home purchase timeline, and the fact that the consumer is actively seeking a mortgage from Redfin and its mortgage partner.

8.    Congress and the California Legislature have long recognized that the privacy of individuals' video-viewing preferences and personal financial information is worthy of heightened protection. As the Senate Judiciary Committee observed in enacting the VPPA, "[privacy] is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom."

S. Rep. No. 100-599, at 6 (1988). Redfin has disregarded those protections for its own commercial gain, enabling Meta and TikTok to target Redfin's consumers with advertising based on their video-viewing and financial profiles.

9. Plaintiff brings this action on behalf of a nationwide class and a California subclass to halt Redfin's unlawful surveillance practices and to recover statutory damages, injunctive relief, and other appropriate remedies.

## THE PARTIES

10. Plaintiff Biljana Gallardo is a citizen of California who resides in Costa Mesa, California.  Plaintiff created a Redfin account using the "Continue with Google" option and accesses her account to watch videos.  Plaintiff has accessed her account and watched videos several times in the last two years.  Plaintiff accesses Redfin videos on the same browser she uses to access her Facebook account, which she created using her real name before she had a Redfin account.

11. Defendant Redfin Corporation is a Delaware corporation with its principal place of business at 1099 Stewart Street, Suite 600, Seattle, Washington 98101. Defendant owns, operates, and controls the Website, www.redfin.com, which it offers to consumers throughout California and the United States. Defendant chose to embed the Meta Pixel and the TikTok Pixel on the Website, and Defendant controls the events and parameters that each pixel transmits to Meta and TikTok, respectively.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States (the VPPA and the ECPA). The Court also has supplemental jurisdiction over Plaintiff's CIPA claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same common nucleus of operative fact.

13. This Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds

$5,000,000, exclusive of interest and costs; there are more than 100 members of the putative Class and Subclass; and at least one member of the Class is a citizen of a state different from Defendant.

14. This Court has personal jurisdiction over Defendant because Defendant conducts continuous and systematic business throughout California, including within this District; markets, promotes, and delivers its services to California residents, including Plaintiff, within this District; and maintains local real estate agents and operations in this District. Defendant's wrongful conduct, including the transmission of Plaintiff's and Class Members' private information via the Meta Pixel and the TikTok Pixel, occurred in this District while Plaintiff and Class Members used the Website in California.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant transacts significant business in this District.

## FACTUAL ALLEGATIONS

**A.    History And Overview Of The VPPA**

16. The origins of the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork
> or Griffin Bell or Pat Leahy watch on television or read
> or think about when they are home.  In an area of
> interactive television cables, the growth of computer
> checking and check-out counters, of security systems and
> telephones, all lodged together in computers, it would be
> relatively easy at some point to give a profile of a person
> and tell what they buy in a store, what kind of food they

like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

17. Accordingly, the VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

18. Individuals who are "aggrieved" by a violation of the VPPA may bring an action for "not less than liquidated damages" of $2,500 per violation, in addition to other remedies. 18 U.S.C. §§ 2710(c)(1)-(2).

**B.    The Gramm-Leach-Bliley Act And The California Financial Information Privacy Act**

19. Congress and the California Legislature have both recognized that consumers' "nonpublic personal information" – including information that a consumer provides to a financial institution or in connection with obtaining a financial product or service – is confidential and must be protected from unauthorized disclosure.

20. Pursuant to 16 C.F.R. § 313.3(n), "nonpublic personal information" means "personally identifiable financial information" and any list, description, or grouping of consumers derived from such information.

21. Pursuant to 16 C.F.R. § 313.3(o), "personally identifiable financial information" includes "[i]nformation a consumer provides to [a financial institution] on an application to obtain a loan, credit card, or other financial product or service";

"[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution]"; and "[a]ny information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)."

22.  Pursuant to 16 C.F.R. § 313.3(k)(1), a "financial institution" means "any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C. 1843(k)." Mortgage brokering and real estate settlement services are activities that are financial in nature or incidental thereto.

23.  Defendant, through the mortgage services it advertises and offers on the Website – including its partnership with a nationally known mortgage lender that allows consumers to obtain a mortgage rate quote through Redfin's own pre-qualification survey hosted at redfin.com/mortgage-get-pre-approved – is significantly engaged in activities that are financial in nature or incidental to such financial activities. Defendant is therefore a "financial institution" within the meaning of 16 C.F.R. § 313.3(k)(1).

24.  The California Legislature enacted CalFIPA to "afford persons greater privacy protections than those provided in" the GLBA. Cal. Fin. Code § 4051(b). CalFIPA defines "nonpublic personal information" to include "personally identifiable financial information . . . provided by a consumer to a financial institution . . . or otherwise obtained by the financial institution," which in turn includes information that a consumer provides to obtain a financial product or service and any "personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server." Cal. Fin. Code § 4052(a)-(b).

25.  A financial institution "shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties

without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5. Along a similar vein, the California Legislature enacted Cal. Civ. Code § 1799.3 which prohibits a "person providing video recording sales or rental services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

### C.    Overview Of The Meta Pixel

26.    Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[1]  Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and are encouraged to share "the name they go by in everyday life."[3]  To that end, when creating an account, users provide their first and last name, along with their birthday, gender, and phone number or email address.[4]

27.    Meta owns Facebook.com and generates revenue by selling advertising space on its website, and other applications it owns, like Instagram.[5]

---

[1] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO!
(July 28, 2021), available https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html.

[2] Sam Schechner & Jeff Horowitz, *How Many Users Does Facebook Have? The Company Struggles to Figure it Out*, Wall St. J. (Oct. 21, 2021) available https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

[3] META, *Community Standards, Part IV Integrity and Authenticity,* available https://www.facebook.com/communitystandards/integrity_authenticity.

[4] META, *Sign Up*, available https://www.facebook.com.

[5] Mike Isaac, *Facebook Profit Surges 101 Percent on Strong Ad Sales*, N.Y. TIMES (July 28, 2021) available https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

---

28.    Meta sells advertising space by highlighting its ability to target users.[6] Meta can target users effectively because it surveils user activity both on and off its site.[7]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "location," and "demographics."[8]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[9]

29.    Businesses can also build "Custom Audiences."[10]  Custom audiences enable businesses to reach "people who already know [their] business," because Meta can track whether they're loyal customers or people who have used a particular business' app or visited their website.[11]  Businesses can use Custom Audiences to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behaviors from your source audience to find new people who share similar qualities."[12]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which

---

[6] META, *Why Advertise on Facebook, Instagram and other Meta Technologies*, available https://www.facebook.com/business/help/205029060038706.
[7] META, *About Meta Pixel*, available https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[8] META, *Audience Ad Targeting*, available https://www.facebook.com/business/ads/ad-targeting.
[9] META, *Easier, More Effective Ways to Reach the Right People on Facebook*, available https://www.facebook.com/business/news/Core-Audiences.
[10] META, *Create a website custom audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[11] META, *Audience ad targeting*, available https://en-gb.facebook.com/business/ads/ad-targeting.
[12] META, *About Lookalike Audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

---

collect and transmit the data automatically.[13]  One such Business Tool is the Meta Pixel.

30.     The Meta Pixel is a piece of code that businesses, like Defendant, can integrate into its Website.  Once activated, the Meta Pixel "allows [the site] to track visitor activity on [their] website."[14] When the Meta Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

31.     Businesses control what actions—or, as Meta calls it, "events"—the Meta Pixel will collect on that business's site, including the website's metadata, along with what pages a consumer views.[15] These include events like PageView, SubscribedButtonClick, and ViewContent.  A "PageView" event records which URL a particular user visited, and a "View Content" event records when a user viewed a particular piece of content on a website. A "SubscribedButtonClick" event records when a visitor clicks a button on the website and reports that button's text and related attributes to Meta. Businesses can also configure the Meta Pixel to track other events.  Meta offers a menu of "standard events" from which businesses can choose to track, including what content a consumer views or purchases.[16]  An advertiser can also create their own tracking parameters by building a "custom event."[17]

---

[13] META, *Create a Customer List Custom Audience*, available https://www.facebook.com/business/help/170456843145568?id=2469097953376494; *See Also* Meta, *Create a Website Custom Audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[14] META, *Meta Pixel*, available https://developers.facebook.com/docs/meta-pixel/.
[15] *See* META, *Meta Pixel, Accurate Event Tracking, Advanced*, available https://developers.facebook.com/docs/facebook-pixel/advanced/; See also Facebook, Best Practices for Facebook Pixel Setup, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[16] META, *Specifications for Facebook Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[17] META, *About Standard and Custom Website Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

---

32.    Likewise, businesses using the pixel on their website control how the Meta Pixel identifies consumers.  The Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[18]  The HTTP Headers collect "IP addresses, information about the web browser, page location, document referrer and persons using the website."[19]  Pixel-specific Data includes "the Pixel ID and Cookie."[20]

33.    The Meta Pixel, like website cookies generally, attaches to the browser that the user uses to access their Facebook account.  That cookie then follows the user's web activity occurring within that same browser.  For example, if the user accesses Facebook.com through their Safari browser, then moves to Redfin.com after leaving Facebook, the Meta Pixel will continue to track that user's activity on that browser.

### D.    Overview of The TikTok Pixel

34.    TikTok is one of the largest social media platforms in the world, with more than one billion monthly active users. Like Meta, TikTok generates advertising revenue by using behavioral data collected across the web to target advertisements to its users.

35.    The TikTok Pixel is a piece of code that third-party websites embed to transmit data to TikTok about visitors' on-site behavior.[21] TikTok represents that its Pixel "is a piece of code that you can place on your website to share visitor events with TikTok" and that, once installed, it "allow[s] you to share website events with TikTok."[22]

36.    The TikTok Pixel is configured to capture "page metadata" and "button clicks."[23] "This information can also be used to personalize ad campaigns for people

[18] META, *Meta Pixel*, https://developers.facebook.com/docs/facebook-pixel/.
[19] *Id.*
[20] *Id.*
[21] TIKTOK, *About TikTok Pixel*, https://ads.tiktok.com/help/article/tiktok-pixel.
[22] *Id.*
[23] *Id.*

on TikTok and improve TikTok's ad delivery systems."[24] When a website has enabled "Automatically Detected" events, the TikTok Pixel transmits a Button Click event whenever a visitor clicks certain on-page elements, including the button's "inner_text," the button's xpath, and other attributes.

### E.      RedFin Has Enabled Advanced Matching On Its Website

37.      Both the Meta and TikTok Pixels utilized a process known as "Advanced Matching" to better "match" the users to the actions those users take on third-party websites like Redfin. In a nutshell, Advanced Matching enables these pixels to also collect the personal information users input into form fields on a third-party websites like Redfin (like names, email addresses, addresses, and phone numbers) and use that information to identify the individuals—even if they do not have accounts with that particular social media company and even if other identifying cookies are not collected.

38.      When a website like Redfin enables "Automatic Advanced Matching," the website's code "will tell your pixel to look for recognizable form fields and other sources on your website that contain information such as first name, last name and email address. The Meta Pixel receives that information along with the event, or action, that took place."[25]

39.      Like the Meta Pixel, the TikTok Pixel also supports Automatic Advanced Matching.[26] This tool "[a]utomatically identifies form fields on pages where the Pixel is installed, and hashes and collects the customer information entered on those pages to optimize targeting and measurement for your ad campaigns."[27] "Personal identifiable Information [sic] (such as name, zip, email and phone) is

---

[24] *Id*.

[25] FACEBOOK, *About advanced matching for web*, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[26] TIKTOK, *About Advanced Matching for web*, https://ads.tiktok.com/help/article/advanced-matching-web.

[27] *Id*.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    12

collected  through which it transmits hashed versions of user identifiers – including hashed email addresses – that TikTok uses to match website visitors to specific TikTok accounts."[28]

40.     The Redfin website has enabled advanced matching for both the TikTok and Meta Pixels. *See* Figures 1-2 below.



**Figure 1**



**Figure 2**

_____

[28] *Id.*

41.    Because Redfin has enabled advanced matching, the TikTok and Meta Pixels collect the information users input into form fields on the site. Most commonly, website users input their email addresses when joining or logging in to Redfin. *See* Figures 3A-D (showing various versions of Join or Sign in screen on website and mobile phone version). Redfin has a form filed for users to input their phone numbers, such as when they wish to schedule a showing.



**Figure 3A**



**Figure 3B**

 

**Figure 3C**                              **Figure3D**

42.     Redfin website visitors that click the Continue with email, Google, Apple, or Facebook buttons are then automatically subscribed to Redfin. At no point thereafter are they ever told by Redfin that they have joined, signed in, or signed up to an account. However, once they link their emails and/or Google and Apple accounts to the websites, they can thereafter save searches and particular homes they have looked at for future searches, schedule appointments to visit homes, leave reviews, and utilize other interactive portions of the website.

**F.     Defendant is a Video Tape Service Provider**

43.     Part of Redfin's business includes the delivery of prerecorded audiovisual materials to consumers throughout the United States. On individual property listing pages on the Website, Defendant prominently features a "Video" button that, when clicked, launches a dedicated prerecorded video tour of the specific home depicted on that listing.

44.    Redfin markets these prerecorded property videos as a central feature of its business model. For example, on search-results pages, Defendant highlights listings that include a video tour with a "3D & VIDEO TOUR" tag as a way to evaluate homes before scheduling an appointment to the listing using Redfin or getting prequalified for a loan using Redfin.



**Figure 4**

///

///

///

///

///

///

///

///

///

///

///

///



**Figure 5**

45.    Indeed, on the video page, Redfin prominently showcases its "Request showing" and "Get prequalified" buttons to monetize its website visitors. *See* Figure 6, next page. As such,  Defendant's delivery of these prerecorded video tours is a material part of the Redfin business.

///

///

///

///

///

///



**Figure 6**

### G.    Redfin Discloses Users' Video Viewing History to TikTok and Meta

46.    Unbeknownst to consumers, whenever they click the Video button to watch the property listing video tours, the Redfin website discloses the video, along with the URL of the page (which includes the property address), to TikTok, along with a hashed email and phone number, via the TikTok Pixel.



**Figure 7**



**Figure 8**

47.     Redfin also discloses the same Video button click, along with the property address and MLS number, along with a user's hashed phone number and external ID to Meta, via the Meta Pixel.



**Figure 9**



**Figure 10**

48.    Meta confirms that the "ph" parameter advanced matching collects corresponds with a particular user's "phone" number and consists of "digits only including country code and area code."[29]

49.    As these screenshots illustrate, Redfin discloses the phone numbers of Redfin users, together with the video and property address of the video tour to both TikTok and Meta. Using any one of many readily available directories (like a

_____

[29] FACEBOOK, *Advanced Matching*, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    20

Yellowpages Phone book), any ordinary person can identify Redfin users with a phone number. *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) (holding that "an individual's… telephone number" is personally identifiable information under the VPPA).

50.     What is more, Redfin discloses the email addresses of Redfin users, together with the video and property address of the video tour to both TikTok and Meta. As one court noted: "Email addresses often expressly include the account holder's name, affiliated organization, or other identifying information. With a simple search engine or a service like Spokeo, an email address can also be used to find personal information such as a corresponding username or physical address." *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017). As such, "an email address may very well readily enable an 'ordinary person' to identify an individual." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017).

51.     The Meta Pixel also transmits to Meta, as part of each such event, the user's c_user cookie value. The c_user contains a user's unencrypted Facebook ID. The c_user cookie is scoped to the .facebook.com domain and is automatically attached to any HTTP request made to facebook.com, including the request transmitting the SubscribedButtonClick event. *See* Figures 11-13 (screenshots of the undersigned's browser developer tools, with the Cookies, Payload, and Header fields of a SubscribedButtonClick event).

| Name | Value | Domain |
|---|---|---|
| ar_debug | 1 | .facebook.com |
| c_user | 1528550551 | .facebook.com |
| datr | rMRiaNCASNnRQ6Rf9eBrzNXc | .facebook.com |
| fr | 1Sg6yDvjBSrIGO5hx.AWfd47Eu1Gcshpy84dMWXO... | .facebook.com |
| ps_n | 1 | .facebook.com |
| sb | FXEXZF66qmf7QYrBRl0wetan | .facebook.com |
| xs | 42%3ATLfINj1tXb2MIA%3A2%3A1776807732%3A-... | .facebook.com |

Headers   Payload   Preview   Response   Initiator   Timing   **Cookies**

**Request Cookies**      ☐ show filtered out request cookies

**Figure 11**

---



**Figure 12**



**Figure 13**

52.     The c_user cookie is "personally identifiable information" within the meaning of the VPPA because it contains a consumer's unencrypted Facebook ID. A Facebook ID allows anybody—not just Meta—to identify the individual Redfin user with a Facebook account. If one types www.facebook.com/[c_user value] into a web browser, it will load the individual's Facebook profile, identifying the user by name.

53.     By transmitting to Meta, in a single event, (i) the fact that the user clicked the "Video" button to watch a specific prerecorded property video, (ii) the title of the specific property video page, (iii) the user's unencrypted Facebook ID via the c_user cookie, and (iv) the user's hashed phone number, Redfin knowingly discloses information that identifies the user as having requested or obtained specific video materials from Redfin.

54.     By transmitting to TikTok, in a single event, (i) the fact that the user clicked the "Video" button to watch a specific prerecorded property video, (ii) the URL of the specific property video page, (iii) the user's hashed phone number, and (iv) the user's hashed email address, Redfin separately and independently knowingly discloses information that identifies the user as having requested or obtained specific video materials from Redfin.

55.     Redfin made these disclosures knowingly because it (i) purposefully installed the Meta and TikTok pixels on its website and (ii) purposefully activated advanced matching.

### H.     Redfin's Mortgage Pre-Qualification Survey Solicits Confidential Financial Information.

56.     Defendant prominently advertises mortgage services on the Website's homepage, via a dedicated "Mortgage" navigation tab, and throughout its property listings. When a consumer clicks "Get prequalified" or a related mortgage call-to-action, Defendant routes the consumer to an interactive mortgage pre-qualification survey hosted at www.redfin.com/mortgage-get-pre-approved. The survey is presented to the consumer within Defendant's own branded interface.

57.     The survey consists of multiple pages of financial and demographic questions, each of which the consumer answers by clicking one of several on-screen buttons. The questions include, without limitation, (i) "When do you hope to purchase your home?" (with options such as "ASAP – signed purchase agreement," "Within 30 days," "2-3 months," "4-5 months," and "Just researching"); (ii) "What

style of home do you want?" (with options such as "Single-family," "Multifamily," "Condo," and "Manufactured"); and (iii) "Your credit profile" (with options such as "720+," "660-719," "620-659," "580-619," and "579 or below").



**Figure 14**



**Figure 15**



Figure 16

Figure 17

**Figure 18**

58.     Consumers reasonably understand the mortgage pre-qualification survey to be a confidential exchange between the consumer and Defendant. Defendant's survey is presented under the Redfin brand, is hosted on the redfin.com domain, and is not framed as an advertisement or as a public solicitation. The consumer's answers bear directly on the consumer's eligibility for, and terms of, a residential mortgage – information that Congress and the California Legislature have specifically identified as "nonpublic personal information" subject to heightened privacy protection.

59.     The information that consumers provide through the mortgage pre-qualification survey – including their self-reported credit score range, home purchase timeline, and home type preferences, together with the fact that the consumer is seeking a mortgage from Defendant – constitutes "nonpublic personal information" and "personally identifiable financial information" within the meaning of the GLBA and CalFIPA.

60.     As these screenshots illustrate, Redfin discloses users' confidential responses to both Meta and TikTok.

## I.   Plaintiff and Class Members Did Not Consent To These Disclosures.

61.   Neither Plaintiff nor any Class Member provided valid consent to Defendant's disclosure of their video-viewing activity and mortgage pre-qualification survey responses to Meta or TikTok.

62.   At no point during the account-creation process, the video-viewing process, or the mortgage pre-qualification process does Defendant present consumers with a standalone consent form – in the form required by 18 U.S.C. § 2710(b)(2)(B)(i) – authorizing Defendant to share their video-viewing history and related identifiers with Meta, TikTok, or any other third party.

63.   The disclosures described above are also not made in the "ordinary course of business" within the meaning of 18 U.S.C. § 2710(a)(2). They are not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." They exist for Defendant's marketing and advertising benefit.

## J.   Plaintiff's Experience

64.   Plaintiff Gallardo created a Redfin account by clicking "Continue with Google," button. By doing so, the Meta and TikTok Pixels collected the phone number and Gmail email address associated with her Google account on Redfin's website. Plaintiff's Gmail email address contains her real name. Plaintiff has used her Redfin account to search for homes, view property listings, and watch prerecorded property videos on the Website on numerous occasions within the applicable statutory periods, including within the past twelve months. She has also input her phone number into form fields on the Redfin website.

65.   Plaintiff accessed the Website using the same browser she uses to log into her Facebook account. Plaintiff provided her real name, email address, and telephone number to Meta when she created her Facebook account.

66.     While Plaintiff was logged into Facebook in the same browser she used to visit the Website, the Meta Pixel transmitted to Meta – in real time and without Plaintiff's consent – events corresponding to Plaintiff's clicks on Redfin's "Video" button and each of Plaintiff's responses in the mortgage pre-qualification survey, along with Plaintiff's unencrypted Facebook ID (via the c_user cookie), the URLs and titles of the specific property listings she viewed, and hashed versions of Plaintiff's phone number and external_id.

67.     The TikTok Pixel likewise transmitted to TikTok, in real time and without Plaintiff's consent, events corresponding to Plaintiff's clicks on Redfin's "Video" button and each of Plaintiff's responses in the mortgage pre-qualification survey, along with the URLs of the pages on which Plaintiff made those selections and a hashed version of Plaintiff's email address and phone number.

68.     Plaintiff did not expect and would not have consented to Defendant sharing her video-viewing activity or her mortgage pre-qualification survey responses with Meta, TikTok, or any other third party.

## CLASS ALLEGATIONS

69.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of herself and the following classes:

**Nationwide Video Privacy Class:** All persons in the United States who have a Redfin account, and clicked the "Video" button on a property listing page on www.redfin.com and had that information disclosed to Meta or TikTok.

**Nationwide ECPA Class:** All persons in the United States who either clicked the "Video" button on a property listing page on www.redfin.com or made responses to Redfin's mortgage pre-qualification survey and had that information disclosed to Meta or TikTok.

**CIPA Subclass:** All persons in the state of California who clicked the "Video" button on a property listing page on www.redfin.com or made

responses to Redfin's mortgage pre-qualification survey and had that information disclosed to Meta or TikTok.

70. Excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, and directors); (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims have been finally adjudicated on the merits or otherwise released; (e) Plaintiff's counsel and Defendant's counsel; and (f) the legal representatives, successors, and assigns of any such excluded persons.

71. Plaintiff reserves the right to modify the Class definitions, including through the use of additional subclasses, based on further investigation and discovery.

72. Numerosity (Fed. R. Civ. P. 23(a)(1)). The Classes are so numerous that joinder of all members is impracticable. Redfin is one of the most trafficked real estate websites in the United States, with tens of millions of monthly visitors. On information and belief, the Classes include thousands, if not millions, of members.

73. Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)). Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. These common questions include, without limitation: (i) whether Defendant is a "video tape service provider" under the VPPA; (ii) whether Defendant knowingly disclosed Plaintiff's and Class Members' PII to Meta and TikTok; (iii) whether Defendant's disclosures were made without consent; (iv) whether Defendant intercepted, or aided in the interception of, Plaintiff's and Class Members' electronic communications in violation of the ECPA and CIPA; (v) whether the communications intercepted by Defendant and its pixel partners constitute "confidential communications" under CIPA § 632; (vi) whether Defendant's conduct constitutes a violation of the GLBA and CalFIPA such that the

ECPA's party exception does not apply; and (vii) whether Plaintiff and Class Members are entitled to damages and other relief.

74.    Typicality (Fed. R. Civ. P. 23(a)(3)). Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, (i) created a Redfin account, (ii) clicked the "Video" button on one or more Redfin property listing pages and had the resulting video-viewing information transmitted to Meta and TikTok, and (iii) used Defendant's mortgage pre-qualification survey and had her responses transmitted to Meta and TikTok – in each case without her consent.

75.    Adequacy (Fed. R. Civ. P. 23(a)(4)). Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex consumer privacy class actions, including VPPA, CIPA, and ECPA actions. Plaintiff's interests do not conflict with the interests of the Classes she seeks to represent, and Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Classes.

76.    Superiority (Fed. R. Civ. P. 23(b)(3)). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members are relatively modest compared to the burden and expense that would be required to litigate claims individually against a well-resourced defendant like Redfin. Individualized litigation would also create the risk of inconsistent or contradictory judgments. A class action, by contrast, permits the consistent adjudication of the claims in a single forum, conserving the resources of the parties and of the judicial system.

77.    Rule 23(b)(2). Defendant has acted on grounds that apply generally to the Classes, such that final injunctive relief and corresponding declaratory relief are appropriate with respect to the Classes as a whole.

## COUNT I
### Violation Of The Video Privacy Protection Act
### 18 U.S.C. § 2710, et seq.
### (On Behalf of Plaintiff and the Nationwide Video Privacy Class)

77.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

78.     Plaintiff brings this claim individually and on behalf of the Nationwide Video Privacy Class.

79.     Defendant is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4) because it is engaged in the business, in and affecting interstate commerce, of the delivery of prerecorded audiovisual materials – namely, the prerecorded property video tours that Defendant delivers to consumers through the Website.

80.     Plaintiff and Class Members are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1) because they are subscribers of Defendant's services. Plaintiff and Class Members created Redfin accounts, provided Defendant with personal information (including their names and email addresses), and received goods and services from Defendant, including access to Defendant's prerecorded property videos, saved searches, personalized home recommendations, and favorite-home functionality, and email newsletters giving them property market updates and links to new properties and video tours of those properties.

81.     Defendant knowingly disclosed to Meta personally identifiable information concerning Plaintiff and Class Members. Specifically, each time Plaintiff or a Class Member clicked the "Video" button on a property listing page, Defendant's Meta Pixel caused the user's browser to transmit to Meta a SubscribedButtonClick event containing (i) the fact that the user clicked the "Video" button to obtain a specific prerecorded property video, (ii) the URL and title of the specific property listing page, (iii) the user's unencrypted Facebook ID via the c_user cookie, and (iv) a hashed version of the user's phone number via the ph Advanced Matching parameter.

82.     Separately and independently, Defendant knowingly disclosed to TikTok personally identifiable information concerning Plaintiff and Class Members. Each time Plaintiff or a Class Member clicked the "Video" button on a property listing page, Defendant's TikTok Pixel caused the user's browser to transmit to TikTok a Button Click event containing (i) the fact that the user clicked a button with inner_text "Video," (ii) the title of the specific property listing page, (iii) a hashed version of the user's phohe number, and (iv) a hashed version of the user's email address.

83.     The information Defendant disclosed to Meta and TikTok constitutes "personally identifiable information" within the meaning of 18 U.S.C. § 2710(a)(3) because, when combined, it identifies Plaintiff and Class Members as having requested or obtained specific video materials from Defendant. An ordinary person in receipt of the disclosures—whether in the form of a Facebook ID, a phone number, or an email address—is able to link the disclosures to specific individuals and thereby identify those individuals as having watched specific prerecorded property videos delivered by Defendant.

84.     Defendant's disclosures were knowing. Defendant chose to install the Meta Pixel and the TikTok Pixel on the Website, chose to configure those pixels to capture SubscribedButtonClick and Button Click events, chose to enable Advanced Matching (including the transmission of hashed phone numbers and hashed email addresses), and entered into contractual relationships with Meta and TikTok for services predicated on the very disclosures challenged here. Defendant has ongoing access to its pixel configurations and dashboards that detail the data being transmitted.

85.     Plaintiff and Class Members did not provide Defendant with informed, written consent, in a form distinct and separate from any form setting forth other legal or financial obligations, 18 U.S.C. § 2710(b)(2)(B)(i), to disclose their video-viewing activity and identifying information to Meta, TikTok, or any other third party.

86.     Defendant's disclosures were not made in the "ordinary course of business" as that term is defined by 18 U.S.C. § 2710(a)(2).

87.     On behalf of herself and the Nationwide Video Privacy Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as necessary to protect the interests of Plaintiff and the Class, including an order requiring Defendant to comply with the VPPA; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); (iv) punitive damages as warranted; and (v) reasonable attorneys' fees and costs and other litigation expenses pursuant to 18 U.S.C. § 2710(c)(2)(C).

## COUNT II
**Violation Of The Electronic Communications Privacy Act**
**18 U.S.C. § 2511, et seq.**
**(On Behalf of Plaintiff and the Nationwide ECPA Class)**

88.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

89.     Plaintiff brings this claim individually and on behalf of the Nationwide ECPA Class.

90.     The ECPA prohibits the intentional interception, disclosure, and use of the contents of any electronic communication. 18 U.S.C. § 2511(1). Section 2520 provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

91.     Plaintiff's and Class Members' interactions with the Website – including their clicks on the "Video" button, their video-viewing activity, and their responses to the mortgage pre-qualification survey – are "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

92.     The "contents" of those communications include the substance, purport, and meaning of the communications, 18 U.S.C. § 2510(8) – that is, the specific property video a consumer requested, the specific mortgage pre-qualification answers a consumer selected, and the identifying information associated with each.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    33

93. The Meta Pixel and the TikTok Pixel are each "electronic, mechanical, or other device[s]" capable of intercepting electronic communications within the meaning of 18 U.S.C. § 2510(5).

94. By embedding the Meta Pixel and the TikTok Pixel on the Website and configuring those pixels to capture the events described above, Defendant intentionally intercepted, endeavored to intercept, and procured Meta and TikTok to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

95. By intentionally disclosing, or endeavoring to disclose, the contents of those electronic communications to Meta and TikTok, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

96. By intentionally using, or endeavoring to use, the contents of those electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

97. The party exception in 18 U.S.C. § 2511(2)(d) does not permit Defendant to escape liability because the interceptions were carried out for the purpose of committing tortious and criminal acts in violation of the Constitution and laws of the United States and of California, including: (i) violations of the GLBA (16 C.F.R. § 313) with respect to the disclosure of "nonpublic personal information" gathered through the mortgage pre-qualification survey; (ii) violations of the VPPA (18 U.S.C. § 2710) with respect to the disclosure of video-viewing PII; (iii) violations of CalFIPA (Cal. Fin. Code § 4052.5) with respect to the disclosure of "nonpublic personal information" gathered through the mortgage pre-qualification survey; and (iv) invasion of privacy under the California Constitution and California common law.

98.     Defendant was not acting under color of law in intercepting Plaintiff's and Class Members' electronic communications.

99.     Plaintiff and Class Members did not consent to Defendant's interception, disclosure, or use of the contents of their electronic communications. Plaintiff and Class Members had a reasonable expectation that Defendant would not redirect their communications to Meta or TikTok without their knowledge or consent.

100.    On behalf of herself and the Nationwide ECPA Class, Plaintiff seeks statutory damages of $10,000, or $100 per day for each violation, under 18 U.S.C. § 2520, together with punitive damages, injunctive and declaratory relief, and reasonable attorneys' fees and costs.

### COUNT III
### Violation Of The California Invasion Of Privacy Act
### Cal. Penal Code § 632
### (On Behalf of Plaintiff and the CIPA Subclass)

101.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

102.    Plaintiff brings this claim individually and on behalf of the CIPA Subclass.

103.    CIPA § 632(a) prohibits any person from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

104.    A "confidential communication" is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

105.    The Meta Pixel and the TikTok Pixel are each an "electronic amplifying or recording device" within the meaning of CIPA § 632(a).

106.    The communications intercepted by Defendant and its pixel partners were confidential. Plaintiff and California Subclass members' private video viewing history was confidential, as such information is protected from disclosure under the VPPA.

CIPA Subclass members' responses to the Redfin mortgage pre-qualification survey—including their self-reported credit score range, home purchase timeline, and home type preferences, as well as the fact that they were applying for a mortgage through Redfin—constitute "nonpublic personal information" under the GLBA and CalFIPA and are, by statute, confidential.

107. In communicating with Defendant through the Website, Plaintiff and CIPA Subclass members had an objectively reasonable expectation of privacy, based in part on the privacy protections established by the GLBA, CalFIPA, the VPPA, and the California Constitution, that their communications would be confined to Defendant and would not be simultaneously disseminated to unannounced third parties such as Meta and TikTok.

108. Defendant, by installing and configuring the Meta Pixel and the TikTok Pixel on the Website, and by funneling Plaintiff's and CIPA Subclass members' communications to Meta and TikTok in real time, aided, permitted, and enabled Meta and TikTok to intentionally use electronic recording devices to eavesdrop upon and record those confidential communications, without the consent of all parties to the communications.

109. Plaintiff and CIPA Subclass members did not consent to Meta's or TikTok's eavesdropping and recording of their confidential communications, nor to Defendant's role in aiding and enabling that conduct.

110. Pursuant to Cal. Penal Code § 637.2, Plaintiff and CIPA Subclass members have been injured by Defendant's violations of CIPA § 632, and each seeks statutory damages of $5,000 for each violation, injunctive relief, and other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, on behalf of herself and all others similarly situated, as follows:

(a)    For an order certifying the Classes pursuant to Fed. R. Civ. P. 23, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)    For an award of statutory damages to the extent available;

(e)    For an award of restitution and disgorgement of profits in an amount to be determined at trial;

(f)    For punitive damages, as warranted, in an amount to be determined at trial;

(g)    For prejudgment interest on all amounts awarded; and

(h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of any and all issues so triable.

Dated: April 24, 2026                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/    Stefan Bogdanovich*
      Stefan Bogdanovich

Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: sbogdanovich@bursor.com

*Attorney for Plaintiff*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    37